IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| EDDISON NUNEZ,<br>     Petitioner<br>          v.<br>UNITED STATES OF AMERICA<br>     Respondent | CIVIL NO. 02-1157(SEC)<br><br>*(Criminal No. 96-280(SEC))* |

**REPORT AND RECOMMENDATION**

**Introduction**

Factual and Procedural Background

Petitioner Eddison Nuñez claims in this Section 2255 proceeding that former counsel's actual conflict of interest, commencing at the outset of the attorney-client relationship and lasting throughout trial, violated his Sixth Amendment guarantee of effective assistance of counsel. Specifically, counsel utterly failed to explain to his client the bare essentials of the federal criminal process, and to discuss with him all matters of significance to his legal predicament. More so, counsel did not even explore with his client the possibility of a plea, through negotiation with the government, or otherwise.

In light of petitioner's non-frivolous and serious allegations, the Court appointed attorney Vilma M. Dapena to represent him under the Criminal Justice Act (see Docket No. 5). Following several status conferences (see Docket Nos. 15, 16 and 17), and discovery (see Docket Nos. 23, 26 and 28), the parties filed supplemental motions to the initial petition (see Docket Nos. 31 and 34). Upon reviewing the same, the Court determined that an evidentiary hearing on the matter was warranted, and ordered that further discovery be provided to petitioner (see Docket Nos. 35 and 36). Further memoranda were subsequently filed by the parties (see Docket Nos. 49, 56 and 62). Again,

**Civil No. 02-1157(SEC)** -2-

upon reviewing the same, the Court noted the necessity of holding an evidentiary hearing (see Docket No. 65). On October 12 and 13, 2004, the Court held the evidentiary hearing in this case (see Docket Nos. 90 and 91 (hearing transcript). Subsequently, the parties filed their respective post-hearing memoranda on the matter (see Docket Nos. 98, 109, 115 and 116).

Having carefully reviewed and considered all the evidence and parties' respective arguments, the Court concludes that petitioner has proven by more than a preponderance of the evidence that his former attorney at all times represented him under an actual conflict of interest. Because of the same, petitioner was not adequately advised within the parameters of what constitutes constitutionally adequate legal representation. Consequently, petitioner's conviction and sentence must be vacated.

Preliminary Challenges Presented by the Government

At the outset, it is important to address the government's contentions that it never extended any plea offer to petitioner, and that the issue now raised was previously resolved on appeal. First, the fact that the government did not at any time extend a plea offer to petitioner (this is not contested by petitioner) is not dispositive of the issue at hand. Rather, the core issue in this case is whether counsel's actual conflict of interest resulted in petitioner's constitutionally sub-par legal representation, which among other matters includes the failure to even explore the possibility of a plea, negotiated or otherwise. As such, petitioner has indeed raised a colorable issue for Section 2255 relief. See Holloway v. Arkansas, 435 U.S. 475, 490-491 (1978) (holding that exploring plea possibilities is an integral part of providing adequate representation of a criminal defendant, and that the same may be precluded by a conflict of interest); see also Robinson v. Stegall, 343 F. Supp. 2d 626, 636-642 (E.D. Mich. 2004)(recognizing Sixth Amendment violation under Holloway where

**Civil No. 02-1157(SEC)**               -3-

counsel, due to conflict of interest, failed to file any potentially favorable pretrial motion on behalf of petitioner).  Next, the Court notes that while petitioner's present claim was indeed raised on appeal, the same was not presented in the Sixth Amendment context, but rather under the lens of Fed. R. Crim. P. 33.  See United States v. Nuñez, 9 Fed. Appx. 28, 31, 2001 WL 656559 * 2 (1st Cir. 2001)(holding that "[w]hile [petitioner] may have a viable claim for post-conviction relief – an issue on which we express no opinion – [he has] failed to show error in the district court's denial of [his Rule 33] motion." Insofar as the present proceeding concerns matters outside the trial record itself – which ordinarily cannot be presented initially on direct appeal – the present Section 2255 motion is the proper procedural vehicle for petitioner to bring his claim.  See United States v. Tabares, 951 F.2d 405, 409 (1st Cir. 1991).

## Legal Analysis

Standard of Habeas Review for Petitioner's Claim

Petitioner in his Section 2255 motion has the affirmative burden of proving by a preponderance of the evidence that he was denied effective assistance of counsel because of a conflict of interest on counsel's part.  United States v. Foster, 469 F.2d 1, 3 (1st Cir. 1972).  Where, as here, a conflict of interest existed, the Court must be "peculiarly sensitive" and prejudice will ordinarily be assumed without requiring petitioner to delineate the precise effects of said conflict . Id.

The Foster approach of assuming prejudice where an actual conflict of interest lies has been adopted by the Supreme Court.  See Cuyler v. Sullivan, 466 U.S. 335, 349-350 (1980) (holding that prejudice is presumed and the petitioner need only show that there was an actual conflict that adversely affected counsel's performance); Holloway v. Arkansas, 435 U.S. at 490- 491  (holding

**Civil No. 02-1157(SEC)**                              -4-

that showing of prejudice because of counsel's conflict of interest "would not be susceptible of intelligent, evenhanded application" because in such circumstances counsel refrains from acting on his client's behalf, "[a]nd to assess the impact of a conflict of interests on the attorney's options, tactics and decisions . . . would be virtually impossible"); see also Familia Consoro v. United States, 160 F.3d 761, 764 (1st Cir. 1998) (holding that petitioner who shows actual conflict need not demonstrate prejudice). With this standard in mind, the Court will proceed to examine the facts that give rise in this case to an actual conflict of interest which adversely affected counsel's performance.

Findings of Fact

The facts adduced below are taken from the testimony of petitioner himself, as well as that of attorney Howard Leader. No witnesses testified on the government's behalf. In addition, the Court also received two exhibits into evidence. The Court, having observed petitioner's demeanor throughout the proceeding, hereby finds his testimony to be both credible and consistent, as well as supported by all the evidence of record, and, thus, extremely reliable from an evidentiary perspective. In other words, the Court understands that petitioner's testimony is not fabricated. Likewise, the Court makes the same finding in regards to the testimony of Mr. Leader, which, in turn, supports petitioner's own account.

*Nuñez's Testimony*

   *Direct Examination*

1. On October 4, 1996, petitioner was arrested by DEA agents along with his brother and four other individuals (Tr. 12, 13). He was subsequently indicted for conspiring to distribute in excess of five kilos of cocaine, in violation of 21 U.S.C. §§ 841 and 846.

2. The following day, while detained at MDC-Guaynabo, petitioner was visited by attorney

**Civil No. 02-1157(SEC)**                -5-

Guillermo Battle Olivo, whom he did not know, and whose presence he had not requested (Tr. 13, 14). Battle informed petitioner that he was there because Nuñez's family had so requested (Tr. 14). He further informed petitioner that as he would be representing his brother, Hansel, he could not represent him also, but had a cousin who was an attorney that could (Tr. 14). This attorney was Carlos Pérez Olivo (Tr. 14).

    3. Battle further told petitioner that Pérez Olivo was a horse ("un caballo") in federal criminal cases, and that he normally charged a fee of $45,000 to $50,000 (Tr. 16). In petitioner's case, however, he was willing to charge $20,000 if Battle was paid the same sum for representing Hansel (Tr. 16).

    4. After Battle left, petitioner was taken back to his unit (Tr. 17). About half an hour later, however, he was called back again for a legal visit (Tr. 17). This new visit was from attorney Díaz Olivo (Tr. 17).

    5. Díaz Olivo informed petitioner that he had spoken to Battle and they both had agreed to represent the Nuñez brothers for $20,000 a piece (Tr. 18). He next stated to petitioner that he had a lot of experience with federal cases and that he knew all the judges and prosecutors, over which he had a lot of influence over (Tr. 20). He also said that he was considered one of the top attorneys in Puerto Rico (Tr. 20). Although his cousin was counsel for his brother, he would be the one setting the defense strategy (Tr. 20-21). He did foresee a lot of trouble, but petitioner should not worry, as he would put everything in control (Tr. 21). He asked petitioner to sign a note addressed to his sister, so that all details concerning his representation be taken care of (Tr. 22).[1]

---

[1] The government objected to said statements made by Pérez Olivo on hearsay grounds. This objection is unfounded, as a court at a suppression hearing may rely on hearsay and other evidence which is inadmissible at trial. Fed. R. Evid. 104(a); United States v. Raddatz, 447 U.S.

**Civil No. 02-1157(SEC)**                                   -6-

  6. At petitioner's detention hearing attorney Pérez Olivo showed up (Tr. 25). Petitioner was surprised, because he knew his family did not have the economic resources to pay for his services, and counsel's fees were due prior to this hearing (Tr. 25). Pérez Olivo informed petitioner that he had received a minimal portion of the retainer fee (Tr. 26).

  7. Some days later, Pérez Olivo showed up at MDC-Guaynabo (Tr. 26-27). There, he informed petitioner that he had received another portion of the money due to him, to wit, $10,500, from an individual named Elario (Tr. 27). Elario was involved with the Nuñez brothers, and had evaded arrest upon their apprehension by federal authorities (Tr. 27).

  8. Up to now, Pérez Olivo had not talked to petitioner about the case, nor explained to him the pending charges, pending discovery process, or evidence (Tr. 29-30).

  9. Following his arraignment, petitioner informed Pérez Olivo of his intention to reach a deal with the prosecution since he had information that would be useful to the government, and at the same time was also aware he was facing a long sentence if convicted (Tr. 30-31). Pérez Olivo, however, told petitioner that he had nothing to gain due to the fact he was facing a minimum of ten years based on drug quantity (Tr. 31). He further told petitioner, that it was not necessary for him to cooperate because there was no evidence in the case against him (Tr. 32). More so, he told petitioner that he did not work with clients who cooperated because he was the attorney of organizations in Puerto Rico which would not hire him if they knew his clients were snitching (Tr.

---

667, 679 (1980); United States v. Del Rosario, 388 F.3d 1, 12 n.5 (1st Cir. 2004). The Court nonetheless finds the same to be admissible under Fed. R. Evid. 804(b)(3), as statements against interest ("a statement . . . so far tended to subject the declarant to civil or criminal liability"). The Court notes that, at a minimum, Pérez Olivo's statements could subject him to disciplinary action as an attorney. This ruling as to admissibility of hearsay statements by Pérez Olivo applies to all other objected statements based on the same ground.

**Civil No. 02-1157(SEC)**                                -7-

32). Based on counsel's advice, petitioner discarded the idea of cooperating (Tr. 32).

     10. Subsequently, Pérez Olivo visited petitioner about fifteen times (Tr. 33). During these occasions he only showed one piece of evidence to petitioner (Tr. 33). This was a paper that had the telephone number of the home petitioner used to live in (Tr. 33). Along with the testimony of Altagracia Domínguez, a cooperating witness, this, according to him, was the only evidence the government had against petitioner (Tr. 33). Pérez Olivo, however, told petitioner not to worry about the cooperator since he had the ability to make her lie when she took the witness stand (Tr. 34). He also told petitioner that she was asking for money in exchange for her testimony (Tr. 35). Pérez Olivo did not show petitioner any other evidence obtained via Rule 16 discovery (Tr. 38-39, 40).

     11. Prior to trial, petitioner again requested that counsel explore a plea with the government so that he could be deported (Tr. 41). Pérez Olivo, however, told petitioner not to give up and that he would set him free (Tr. 41).

     12. Petitioner and counsel never discussed prior to trial the possible sentencing scenarios as to him under the then-mandatory U.S. Sentencing Guidelines (Tr. 42). Counsel told petitioner that he had nothing to gain by a plea as he was facing a minimum of ten years, and if he went to trial he would at a most get twelve years (Tr. 42).

     13. At another point prior to trial, petitioner again told counsel that he could provide information to the government about Elario Pantojas, the individual who had avoided arrest, and who had also paid Pérez Olivo most of his legal fees (Tr. 44-45). Counsel, however, warned him that if he decided to cooperate he would be left without an attorney (Tr. 46).

     14. Just prior to trial, Pérez Olivo again met with petitioner. He discussed three possible scenarios with him (Tr. 51-52). First, he could go to trial and point all the responsibility to Elario

**Civil No. 02-1157(SEC)**                                -8-

Fernandez, in whose home the drugs were found (Tr. 51). The second option was to plea guilty, but this he did not recommend because he would not get less than ten years, and by going to trial he would only get a maximum of twelve years (Tr. 51). The final option was to "buy" the jury for $75,000, of which $50,000 had to be paid up front (Tr. 51-52). This option was not unusual to petitioner since in his native country, the Dominican Republic, it is a common means to buy ones liberty (Tr. 53).

     15. Upon commencement of petitioner's trial, counsel informed him that two codefendants had entered pleas and would testify against him (Tr. 56). Counsel did not then explore plea alternatives with petitioner, instead telling him that this was good as the witness' testimony would be contradictory (Tr. 56-57). After jury selection, counsel told petitioner the same went well and that they had someone "inside" the jury (Tr. 57-58).

     16. Once the prosecutor made her opening statement defendant surpisingly became aware of the abundant and detailed evidence that the government had against him (Tr. 58). The evidence presented only confirmed the prosecutor's case (Tr. 59-60).

     17. Following the presentation of the government's evidence, Pérez Olivo asked petitioner for the $50,000 to pay for the bribe which would set him free (Tr. 83). The next day, in court, counsel had petitioner sign off the titles to two cars which petitioner and his brother owned, whose sale proceeds would be used towards bribing the prosecutor and juror (Tr. 83-84). Once signed, counsel raised the titles as if signaling someone (Tr. 84).

     18. The jury nonetheless rendered a guilty verdict (Tr. 85). Counsel told petitioner not to worry, and that he would have him out in six months time (Tr. 85). Following this, petitioner's mother contacted a new attorney to represent petitioner, to wit, Howard Leader (Tr. 86).

**Civil No. 02-1157(SEC)**                              -9-

19. Leader traveled to Puerto Rico shortly after trial and met with petitioner (Tr. 86). He told counsel that since the beginning he wanted to cooperate with the government, but Pérez Olivo had closed such avenue (Tr. 87). He also gave Leader instructions to approach the government on his behalf to cooperate and inform of Pérez Olivo's acts (Tr. 87).

20. As a result, petitioner met with FBI agents (Tr. 87-89). The agents proceeded to wire petitioner so as to record his conversation with Pérez Olivo (Tr. 89-91). Petitioner then met with Pérez Olivo at MDC-Guaynabo (Tr. 91). He asked him what he had done with the money that was going to be used to pay the jury and prosecutor who were bribed (Tr. 91). Pérez Olivo, however, was suspicious and responded with evasive answers (Tr. 91-92). No further attempts to record counsel were made (Tr. 92-93).

21. Subsequently, petitioner testified in a disbarment proceeding in this Court brought against attorney Pérez Olivo (Tr. 94-95). Before a ruling on the disciplinary matter was issued by Magistrate Judge Delgado, attorney Pérez Olivo voluntarily resigned from practicing before this Court (Tr. 95).

*Cross-Examination*

Nuñez's testimony during cross-examination does not contradict the above factual findings (1--21) made by the Court. To the contrary, it is consistent with his version of what took place between him and Pérez Olivo. Below are additional findings adduced from this part of his testimony.

22. Prior to trial, counsel gave petitioner three options, to wit, plea guilty, go to trial or engage in a bribe which would put him out in the street (Tr. 192, 206--210). He opted for the latter, and believed that it was common practice to pay a monetary amount, here $75,000, to buy his way

**Civil No. 02-1157(SEC)**                              -10-

out (Tr. 193 - 194, 207- 209).  More so, he understood that because Pérez Olivo was an experienced attorney, this route was best for him (Tr. 195).  Further, he knew that in the Dominican Republic this was a common practice which occurs daily, and he has never heard of anyone being imprisoned for doing so (Tr. 207--208).

23. Petitioner was always interested in cooperating with the government (Tr. 195).  However, Pérez Olivo never advised him whether the government in fact had or had not extended to him any offer (Tr. 196).

24. Prior to trial petitioner did not enter a straight plea because he had no knowledge of the law; he only knew what counsel told him (Tr. 197).  At trial, he took the witness stand and declared his innocence because he was following counsel's instructions, even though he knew he was not innocent (Tr. 197-198).

25. Following his arrest, and up to the time of his initial appearance, petitioner, who was not yet represented by counsel, did not communicate to anyone that he wanted to cooperate because he was terrified at the time (Tr. 199).

26. At the disciplinary hearing against Pérez Olivo before Magistrate Judge Delgado petitioner testified (Tr. 201--206).  During the same he told the Judge about counsel's proposal of $ 75,000, and about his recommendation not to plead guilty (Tr. 204).  He also believes, but is not completely certain, that at the time he informed the Judge that he was never made a plea offer (Tr. 205--206).

27. The first time he mentioned Pérez Olivo's bribe to anyone other than counsel was after his conviction to the FBI agents (Tr. 210--211).  He does not know whether anyone actually got paid (Tr. 211).

**Civil No. 02-1157(SEC)**                -11-

28. During the entire process leading up to his conviction, petitioner never thought about retaining another attorney because he thought he had the best one in Puerto Rico (Tr. 216).

*Attorney Leader's Testimony*

29. Attorney Howard Leader, a member of the New York bar, has been practicing almost exclusively criminal defense since 1982 (Tr. 102). The bulk of his work relates to federal cases involving narcotics and money laundering (Tr. 103). Prior to meeting petitioner he had represented his sister, Clarissa, in a federal criminal matter in the Eastern District of New York and was able to obtain for her a probationary sentence (Tr. 103). After petitioner was convicted, Clarissa contacted Leader and arranged for him to meet with petitioner (Tr. 103--104).

30. Leader met petitioner for the first time at MDC-Guaynabo on April 8, 1997 (Tr. 104). On that occasion they met for nearly three hours and had a very detailed discussion (Tr. 104). Leader became horrified at the fact that at said time petitioner "*had never really understood fundamental, basic principles of how our criminal justice system works, what his options really were, whether he could've in fact been able to negotiate, say some sort of plea agreement short to trial, whether in fact that he could've cooperated with the government, apparently despite wanting to do both of those things. . . . if he tried to cooperate with the government, that his understanding was that he would be left alone without counsel*" (Tr. 105). "*[T]here had been no discussion whatever as to the extent, the nature, the scope, the type, the quantity, the quality of the government's case that would be presented at trial against him, there was no discussion of the federal sentencing guidelines and how these would operate to require a sentencing judge to impose a sentence significantly greater than what might have been obtained had Eddison been able to negotiate a plea agreement through his attorney. . . . Eddison was under the impression that there*

**Civil No. 02-1157(SEC)**                              -12-

*was basically no difference between going to trial and trying to negotiate a plea agreement. . . . There was no discussion as to how acceptance of responsibility would be denied or could be denied post trial, no discussion about the operation of the safety valve, no discussion about the operation of role adjustments, no detailed analysis in terms of guideline calculations . . .*"(Tr. 106--107).

      31. Some weeks later, Leader received a call from Pérez Olivo, which was answered by his legal assistant (Tr. 105). He told her that none of the two knew each other professionally, but that he hoped Leader was not the type of lawyer who has his clients cooperate (Tr. 105). On April 22, 1997, both attorneys did in fact converse over the telephone and Pérez Olivo told Leader that he thought that the case was triable, that almost no one wins a criminal case in Puerto Rico, but he would nonetheless have bet his horse on petitioner's, thus he was shocked when the guilty verdict came down, as were the marshals and prosecutors (Tr. 108).

      32. Prior to his sentence, petitioner expressed to Leader that he was still interested in cooperating with the government in any manner which would reduce his sentence (Tr. 115). In light of this, Leader arranged for a meeting with U.S. Attorney Guillermo Gil in late August or early September of 1997 (Tr. 117). It was agreed there that the government would meet with petitioner for a proffer (Tr. 117). On September 19, 1997, the meeting with FBI agents and AUSA Desiree Laborde took place to explore a possible attempt to obstruct justice by Pérez Olivo; the same lasted several hours (Tr. 118). At said debriefing, petitioner recanted everything concerning Pérez Olivo's representation, such as the advice not to enter into a plea, the instruction to perjure himself at trial, and the bribe (Tr. 119). Leader had also informed AUSA Laborde that his client also had information about other targets, such as the fugitive in his case (Tr. 177). However, at this time, the government wanted to focus on Pérez Olivo (Tr. 177).

**Civil No. 02-1157(SEC)**              -13-

33. Prior to sentencing, Leader had to request the Court to order the government to provide him with a fresh batch of discovery, as Pérez Olivo had not provided the same, nor the case file, to him, despite numerous calls to said effect (Tr. 121--123). The Court granted said motion (Tr. 122).

34. Following petitioner's conviction, Leader spoke with AUSA Laborde from fifteen to twenty times (Tr. 123). She informed him that petitioner's counsel had never even approached her to discuss possible plea negotiations (Tr. 124).

<u>Conclusions of Law</u>

Based on its findings of fact, the Court concludes that petitioner, by more than a preponderance of the evidence, has proven that attorney Pérez Olivo at all relevant times represented him under an actual conflict of interest.

At the outset, the manner in which counsel first met with petitioner at MDC-Guaynabo is highly suspicious, to say the least. Add to this the fact that petitioner's family at the time did not have the economic means to retain counsel's costly services for him and his brother. More so, Pérez Olivo told petitioner that his fees had in part been paid by an individual involved in the same criminal activity as him, but who had eluded capture. He also told him that he represented organizations in Puerto Rico that did not like his clients to cooperate with the government. Likewise, he told attorney Leader's assistant to tell him that he hoped Leader was not the type of attorney who had his clients turn government witness.

Throughout his entire representation of petitioner, Pérez Olivo purposely failed to discuss with his client, the specific evidence the government would present at trial, which had been available via discovery. He also failed to discuss the intricate nuances of the federal criminal process with his client. Aside from telling petitioner he would face ten or twelve years imprisonment if he pleaded

**Civil No. 02-1157(SEC)**                -14-

guilty or was convicted, respectively, counsel failed to discuss with him the impact of the then-mandatory Sentencing Guidelines, as well as alternatives to the minimum mandatory term of imprisonment he faced. These facts have been corroborated by attorney Leader's testimony as to his initial meeting with petitioner.

More so, at all times Pérez Olivo staunchly emphasized to petitioner that cooperation was not a feasible alternative. Rather, he made petitioner believe that paying a $75,000 bribe was the best avenue. Said advise not to cooperate is corroborated by the fact that counsel did not once approach the prosecutor to inquire as to plea alternatives. The fact that counsel suggested to petitioner that a bribe would be his ticket out is corroborated by the fact that the FBI indeed looked into the matter and even wired petitioner.

In sum, we have before us the picture of an attorney whose services are not costed by petitioner nor his family, and, in essence, discusses nothing about the case with petitioner save for not cooperating with the government and going to trial, and does not explore with the government any possible alternatives for his client. It is quite logical thus, to conclude from the evidence that counsel at all times represented the interests of a third party or parties, if not his own.

This is not the first instance where attorney Pérez Olivo engages in such unethical conduct, to say the least. To the contrary, he has demonstrated a repeated pattern for disrupting the effective administration of justice and acting contrary to his clients' best interests. He was disbarred by the Puerto Rico Supreme Court on December 14, 2001 (see Petitioner's Exhibit 1). Said High Court noted that he received $30,000.00 for a federal criminal appeal which he never filed. He never again communicated with his client, and further failed to respond to the numerous court orders in the disbarment proceeding. In the case of Confesor Falú González v. United States, Civil 01-1127(SEC)

**Civil No. 02-1157(SEC)**               -15-

(see Petitioner's Exhibit 2), the Court granted habeas relief where a possible plea offer had been made to Pérez Olivo's client, and counsel utterly failed to disclose the same, instead prompting his client to go to trial and ultimately be convicted.  Lastly, the Court will take notice that after the commencement of his disbarment proceeding in this Court before Magistrate Judge Delgado, in which both Confesor Falú and petitioner, among other former clients, testified, Pérez Olivo voluntarily resigned from the bar of this Court.

It would seem thus, that Pérez Olivo is a highly unethical legal practitioner, who cares little about his clients' best interests under the given circumstances.  The Confesor Falú case is merely another example of how counsel, for his own benefit, or, more probably someone else's, has his client go to trial without ethically exploring all available or possible legal alternatives with him.

Our federal Constitution is too precious a thing to sanction the legal representation of a person accused of a felony offense by an individual of Pérez Olivo's unscrupulous attributes, as clearly evidenced in this case.  This is why our constitutional jurisprudence, *ante*, does not require petitioner to make a showing of prejudice once counsel's actual conflict of interest is evidenced, as is the case here.  Even so, in this instance of an actual conflict of interest, attorney Pérez Olivo failed to advise his client, as required by ABA Model Rules 1.4(a) and (b), of all matters necessary to permit him to make informed decisions in his criminal case.  Furthermore, he enticed petitioner to seemingly seek an illegal way out of his legal predicament, rather than fully explore with his client all available alternatives prior to and during trial.[2]  These detrimental acts simply do not vanish

---

[2] In this respect the Court understands that petitioner should not be equitably estopped from bringing the present *habeas* proceeding.  As discussed above, petitioner's attempt to bribe a juror and/or prosecutor were the result of counsel's own prompting and advise to him.  In addition, the government has not invoked this doctrine in this case.

**Civil No. 02-1157(SEC)**                          -16-

because counsel at trial acted in a competent manner before the Court.

Certainly, the evidence of petitioner's guilt in this case is overwhelming, and more likely than not, a conviction at trial would have resulted no matter who represented him. Defendant himself, now admits his guilt. However, abundant evidence of guilt is not a factor to be considered in granting *habeas* relief in the present scenario.

Accordingly, having found extreme merit in the present Section 2255 petition, the same must be granted. Petitioner's conviction, sentence and judgment in Criminal Case 96-280(SEC) shall be VACATED accordingly.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(d), any party who objects to this report and recommendation must file a written objection thereto with the Clerk of the Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985), reh'g denied, 474 U.S. 1111 (1986); Davet v. Maccorone, 973 F. 2d 22, 30/31 (1st Cir. 1992).

SO RECOMMENDED
In San Juan, Puerto Rico, this 13TH of April, 2005

*S/ Gustavo A. Gelpi*
GUSTAVO A. GELPI
United States Magistrate Judge