## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

EDDISON NUNEZ            *
                                  *
       Petitioner             *
                                  *
v.                                 *       **Civil No. 02-1157(SEC)**
                                  *
UNITED STATES OF AMERICA     *
                                  *
       Respondent          *
*********************************

## OPINION AND ORDER

Before the Court is Petitioner's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Docket #1). On February 7, 2002 the Court referred this case to Magistrate-Judge Gustavo Gelpí for a Report and Recommendation (Docket # 2). On April 14, 2005 Magistrate Gelpí issued his report, recommending that the petition be granted and that Petitioner's conviction, sentence and judgment in Criminal Case 96-280(SEC) be vacated accordingly (Docket # 122). The Government has not filed any objections to the Magistrate's report and the time allotted for doing so, including the requested extension, has expired.[1] Therefore, the Court will **APPROVE** and **ADOPT** the Magistrate's Report and Recommendation, **GRANT** Petitioner's motion, and **VACATE** Petitioner's sentence and judgment in Criminal Case 96-280(SEC).

### Procedural Background

From the outset Petitioner has asserted that his trial counsel had an actual conflict of interest, commencing at the inception of the attorney-client relationship and lasting throughout the trial, in violation of his right to effective assistance of counsel under the Sixth Amendment. Petitioner claims that his counsel failed to explain to him the nuances of the

---

[1] On even date, the Court denied the Government's untimely request for a second thirty-day extension of time, noting that The Magistrate Judge recommended that Petitioner's conviction and sentence be vacated and that Petitioner has been incarcerated for **nearly nine years** (Docket # 130).

criminal process and the evidence against him and failed to explore the possibility of a plea, through negotiations with the Government or otherwise. Given the gravity of Petitioner's allegations, Magistrate Gelpí appointed Attorney Vilma M. Dapena to represent him under the Criminal Justice Act and ordered the Government to respond to Petitioner's motion (Dockets ## 3 & 5). Following said appointment, Magistrate Gelpí held various status conferences (Dockets ## 15-17), granted a period for discovery Petitioner (Dockets ## 23, 26, 28, 35 & 36), received supplemental motions and memoranda (Dockets ## 31,  34, 49, 56 & 62), and held an evidentiary hearing which lasted two days (Dockets ## 85-86). After the hearing, Magistrate Gelpí received post-hearing briefs from the parties (Dockets ## 98, 109, 115-116). Upon careful review of the case, Magistrate Gelpí concluded that Petitioner had proven by more than a preponderance of the evidence that his trial attorney at all times represented him under an actual conflict of interest and due to this Petitioner did not receive effective assistance of counsel. Thus, Magistrate Gelpí recommended that Petitioner's conviction, sentence, and judgment in Criminal Case 96-280(SEC) be vacated. We agree.

### Standard of Review

The scope of review of a Magistrate's recommendation is set forth in 28 U.S.C. § 636(b)(1)(c). This section provides that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified findings or recommendations to which [an] objection is made." Id. The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," however, if the affected party fails to timely file objections,"'the district court can assume that they have agreed to the magistrate's recommendation.'" Alamo-Rodríguez v. Pfizer Pharms., Inc., 286 F. Supp. 2d 144, 146 (D.P.R. 2003) (quoting Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985)). Thus, no review is required of those issues to which objections are not timely raised. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987). In fact, a party who fails to file any

objections to the Magistrate Judge's Report and Recommendation within ten days of its filing waives his or her right to appeal from the district court's order. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); United States v. Valencia-Copete, 792 F.2d 4, 5 (1st Cir. 1986); Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992) ("[f]ailure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objection are precluded on appeal").

### Applicable Law and Analysis

Neither party has filed objections to the Magistrate Judge's Report and Recommendation, thus we are not required by law to review it. However, upon review, we find no fault with Magistrate Judge Gelpí's assessment. The findings of fact detailed in the Report and Recommendation are adequately supported by the record. We give deference to the Magistrate, who observed Petitioner's demeanor throughout the proceedings and heard his testimony in both direct and cross-examination as well as the testimony of Attorney Howard Leader, who represented Petitioner after he was convicted. To that effect, Magistrate Gelpí highlighted that Petitioner's testimony was credible, consistent and supported by the evidence. In order to facilitate review, we will transcribe the findings of fact made in the Report.

1.   On October 4, 1996, petitioner was arrested by DEA agents along with his brother and four other individuals (Tr. 12, 13). He was subsequently indicted for conspiring to distribute in excess of five kilos of cocaine, in violation of 21 U.S.C. §§ 841 and 846.

2.   The following day, while detained at MDC-Guaynabo, petitioner was visited by attorney Guillermo Battle Olivo, whom he did not know, and whose presence he had not requested (Tr. 13, 14). Battle informed petitioner that he was there because Nuñez's family had so requested (Tr. 14). He further informed petitioner that as he would be representing his brother, Hansel, he could not represent him also, but had a cousin who was an attorney that could (Tr. 14). This attorney was Carlos Pérez Olivo (Tr. 14).

3.   Battle further told petitioner that Pérez Olivo was a horse ("un caballo") in federal criminal cases, and that he normally charged a fee of $45,000 to $50,000 (Tr. 16). In petitioner's case, however, he was willing to charge $20,000 if Battle was paid the same sum for representing Hansel (Tr. 16).

4.    After Battle left, petitioner was taken back to his unit (Tr. 17). About half an hour later, however, he was called back again for a legal visit (Tr. 17). This new visit was from attorney [][Pérez] Olivo (Tr. 17).

5.    [][Pérez] Olivo informed petitioner that he had spoken to Battle and they both had agreed to represent the Nuñez brothers for $20,000 a piece (Tr. 18). He next stated to petitioner that he had a lot of experience with federal cases and that he knew all the judges and prosecutors, over which he had a lot of influence [] (Tr. 20). He also said that he was considered one of the top attorneys in Puerto Rico (Tr. 20). Although his cousin was counsel for his brother, he would be the one setting the defense strategy (Tr. 20-21). He did foresee a lot of trouble, but petitioner should not worry, as he would put everything in control (Tr. 21). He asked petitioner to sign a note addressed to his sister, so that all details concerning his representation be taken care of (Tr. 22).

6.    At petitioner's detention hearing attorney Pérez Olivo showed up (Tr. 25). Petitioner was surprised, because he knew his family did not have the economic resources to pay for his services, and counsel's fees were due prior to this hearing (Tr. 25). Pérez Olivo informed petitioner that he had received a minimal portion of the retainer fee (Tr. 26).

7.    Some days later, Pérez Olivo showed up at MDC-Guaynabo (Tr. 26-27). There, he informed petitioner that he had received another portion of the money due to him, to wit, $10,500, from an individual named Elario (Tr. 27). Elario was involved with the Nuñez brothers, and had evaded arrest upon their apprehension by federal authorities (Tr. 27).

8.    Up to now, Pérez Olivo had not talked to petitioner about the case, nor explained to him the pending charges, pending discovery process, or evidence (Tr. 29-30).

9.    Following his arraignment, petitioner informed Pérez Olivo of his intention to reach a deal with the prosecution since he had information that would be useful to the government, and at the same time was also aware he was facing a long sentence if convicted (Tr. 30-31). Pérez Olivo, however, told petitioner that he had nothing to gain due to the fact he was facing a minimum of ten years based on drug quantity (Tr. 31). He further told petitioner, that it was not necessary for him to cooperate because there was no evidence in the case against him (Tr. 32). More so, he told petitioner that he did not work with clients who cooperated because he was the attorney of organizations in Puerto Rico which would not hire him if they knew his clients were snitching (Tr. 32). Based on counsel's advice, petitioner discarded the idea of cooperating (Tr. 32).

10.    Subsequently, Pérez Olivo visited petitioner about fifteen times (Tr. 33). During these occasions he only showed one piece of evidence to petitioner (Tr. 33). This was a paper that had the telephone number of the home petitioner used to live in (Tr. 33). Along with the testimony of Altagracia Domínguez, a cooperating witness, this, according to him, was the only evidence the government had against petitioner (Tr. 33). Pérez Olivo, however, told petitioner not to worry about the cooperator since he had the ability to make her lie when she took the witness stand (Tr. 34). He also told petitioner that she was asking for money in exchange for her testimony (Tr. 35). Pérez Olivo did not show petitioner any other evidence obtained via Rule 16 discovery (Tr. 38-39, 40).

11.    Prior to trial, petitioner again requested that counsel explore a plea with the government so that he could be deported (Tr. 41). Pérez Olivo, however, told petitioner not to give up and that he would set him free (Tr. 41).

12.    Petitioner and counsel never discussed prior to trial the possible sentencing scenarios as to him under the then-mandatory U.S. Sentencing Guidelines (Tr. 42). Counsel told petitioner that he had nothing to gain by a plea as he was facing a minimum of ten years, and if he went to trial he would at a most get twelve years (Tr. 42).

13.    At another point prior to trial, petitioner again told counsel that he could provide information to the government about Elario Pantojas, the individual who had avoided arrest, and who had also paid Pérez Olivo most of his legal fees (Tr. 44-45). Counsel, however, warned him that if he decided to cooperate he would be left without an attorney (Tr. 46).

14.    Just prior to trial, Pérez Olivo again met with petitioner. He discussed three possible scenarios with him (Tr. 51-52). First, he could go to trial and point all the responsibility to Elario Fernandez, in whose home the drugs were found (Tr. 51). The second option was to plea guilty, but this he did not recommend because he would not get less than ten years, and by going to trial he would only get a maximum of twelve years (Tr. 51). The final option was to "buy" the jury for $75,000, of which $50,000 had to be paid up front (Tr. 51-52). This option was not unusual to petitioner since in his native country, the Dominican Republic, it is a common means to buy ones liberty (Tr. 53).

15.    Upon commencement of petitioner's trial, counsel informed him that two codefendants had entered pleas and would testify against him (Tr. 56). Counsel did not then explore plea alternatives with petitioner, instead telling him that this was good as the witness' testimony would be contradictory (Tr. 56-57). After jury selection, counsel told petitioner the same went well and that they had someone "inside" the jury (Tr. 57 -58).

16.    Once the prosecutor made her opening statement defendant surpisingly [sic] became aware of the abundant and detailed evidence that the government had against him (Tr. 58). The evidence presented only confirmed the prosecutor's case (Tr. 59-60).

17.    Following the presentation of the government's evidence, Pérez Olivo asked petitioner for the $50,000 to pay for the bribe which would set him free (Tr. 83). The next day, in court, counsel had petitioner sign off the titles to two cars which petitioner and his brother owned, whose sale proceeds would be used towards bribing the prosecutor and juror (Tr. 83-84). Once signed, counsel raised the titles as if signaling someone (Tr. 84).

18.    The jury nonetheless rendered a guilty verdict (Tr. 85). Counsel told petitioner not to worry, and that he would have him out in six months time (Tr. 85). Following this, petitioner's mother contacted a new attorney to represent petitioner, to wit, Howard Leader (Tr. 86).

19.    Leader traveled to Puerto Rico shortly after trial and met with petitioner (Tr. 86). He told counsel that since the beginning he wanted to cooperate with the government, but Pérez Olivo had closed such avenue (Tr. 87). He also gave Leader instructions to

approach the government on his behalf to cooperate and inform of Pérez Olivo's acts (Tr. 87).

20.   As a result, petitioner met with FBI agents (Tr. 87-89). The agents proceeded to wire petitioner so as to record his conversation with Pérez Olivo (Tr. 89-91). Petitioner then met with Pérez Olivo at MDC-Guaynabo (Tr. 91). He asked him what he had done with the money that was going to be used to pay the jury and prosecutor who were bribed (Tr. 91). Pérez Olivo, however, was suspicious and responded with evasive answers (Tr. 91-92). No further attempts to record counsel were made (Tr. 92-93).

21.   Subsequently, petitioner testified in a disbarment proceeding in this Court brought against attorney Pérez Olivo (Tr. 94-95). Before a ruling on the disciplinary matter was issued by Magistrate Judge Delgado, attorney Pérez Olivo voluntarily resigned from practicing before this Court (Tr. 95).

22.   Prior to trial, counsel gave petitioner three options, to wit, plea guilty, go to trial or engage in a bribe which would put him out in the street (Tr. 192, 206-210). He opted for the latter, and believed that it was common practice to pay a monetary amount, here $75,000, to buy his way out (Tr. 193-194, 207- 209). More so, he understood that because Pérez Olivo was an experienced attorney, this route was best for him (Tr. 195). Further, he knew that in the Dominican Republic this was a common practice which occurs daily, and he has never heard of anyone being imprisoned for doing so (Tr. 207-208).

23.   Petitioner was always interested in cooperating with the government (Tr. 195). However, Pérez Olivo never advised him whether the government in fact had or had not extended to him any offer (Tr. 196).

24.   Prior to trial petitioner did not enter a straight plea because he had no knowledge of the law; he only knew what counsel told him (Tr. 197). At trial, he took the witness stand and declared his innocence because he was following counsel's instructions, even though he knew he was not innocent (Tr. 197-198).

25.   Following his arrest, and up to the time of his initial appearance, petitioner, who was not yet represented by counsel, did not communicate to anyone that he wanted to cooperate because he was terrified at the time (Tr. 199).

26.   At the disciplinary hearing against Pérez Olivo before Magistrate Judge Delgado petitioner testified (Tr. 201-206). During the same he told the Judge about counsel's proposal of $ 75,000, and about his recommendation not to plead guilty (Tr. 204). He also believes, but is not completely certain, that at the time he informed the Judge that he was never made a plea offer (Tr. 205-206).

27.   The first time he mentioned Pérez Olivo's bribe to anyone other than counsel was after his conviction to the FBI agents (Tr. 210-211). He does not know whether anyone actually got paid (Tr. 211).

28.   During the entire process leading up to his conviction, petitioner never thought about retaining another attorney because he thought he had the best one in Puerto Rico (Tr. 216).

29.  Attorney Howard Leader, a member of the New York bar, has been practicing almost exclusively criminal defense since 1982 (Tr. 102). The bulk of his work relates to federal cases involving narcotics and money laundering (Tr. 103). Prior to meeting petitioner he had represented his sister, Clarissa, in a federal criminal matter in the Eastern District of New York and was able to obtain for her a probationary sentence (Tr. 103). After petitioner was convicted, Clarissa contacted Leader and arranged for him to meet with petitioner (Tr. 103-104).

30.  Leader met petitioner for the first time at MDC-Guaynabo on April 8, 1997 (Tr. 104). On that occasion they met for nearly three hours and had a very detailed discussion (Tr. 104). Leader became horrified at the fact that at said time petitioner "*had never really understood fundamental, basic principles of how our criminal justice system works, what his options really were, whether he could've in fact been able to negotiate, say some sort of plea agreement short to trial, whether in fact that he could've cooperated with the government, apparently despite wanting to do both of those things. . . . if he tried to cooperate with the government, that his understanding was that he would be left alone without counsel*" (Tr. 105). "*[T]here had been no discussion whatever as to the extent, the nature, the scope, the type, the quantity, the quality of the government's case that would be presented at trial against him, there was no discussion of the federal sentencing guidelines and how these would operate to require a sentencing judge to impose a sentence significantly greater than what might have been obtained had Eddison been able to negotiate a plea agreement through his attorney. . . . Eddison was under the impression that there was basically no difference between going to trial and trying to negotiate a plea agreement. . . . There was no discussion as to how acceptance of responsibility would be denied or could be denied post trial, no discussion about the operation of the safety valve, no discussion about the operation of role adjustments, no detailed analysis in terms of guideline calculations . . .*"(Tr. 106-107).

31.  Some weeks later, Leader received a call from Pérez Olivo, which was answered by his legal assistant (Tr. 105). He told her that none of the two knew each other professionally, but that he hoped Leader was not the type of lawyer who has his clients cooperate (Tr. 105). On April 22, 1997, both attorneys did in fact converse over the telephone and Pérez Olivo told Leader that he thought that the case was triable, that almost no one wins a criminal case in Puerto Rico, but he would nonetheless have bet his horse on petitioner's, thus he was shocked when the guilty verdict came down, as were the marshals and prosecutors (Tr. 108).

32.  Prior to his sentence, petitioner expressed to Leader that he was still interested in cooperating with the government in any manner which would reduce his sentence (Tr. 115). In light of this, Leader arranged for a meeting with U.S. Attorney Guillermo Gil in late August or early September of 1997 (Tr. 117). It was agreed there that the government would meet with petitioner for a proffer (Tr. 117). On September 19, 1997, the meeting with FBI agents and AUSA Desiree Laborde took place to explore a possible attempt to obstruct justice by Pérez Olivo; the same lasted several hours (Tr. 118). At said debriefing, petitioner recanted everything concerning Pérez Olivo's representation, such as the advice not to enter into a plea, the instruction to perjure himself at trial, and the bribe (Tr. 119). Leader had also informed AUSA Laborde that his client also had information about other targets, such as the fugitive in his case (Tr. 177). However, at this time, the government wanted to focus on Pérez Olivo (Tr. 177).

33.    Prior to sentencing, Leader had to request the Court to order the government to provide him with a fresh batch of discovery, as Pérez Olivo had not provided the same, nor the case file, to him, despite numerous calls to said effect (Tr. 121-123). The Court granted said motion (Tr. 122).

34.    Following petitioner's conviction, Leader spoke with AUSA Laborde from fifteen to twenty times (Tr. 123). She informed him that petitioner's counsel had never even approached her to discuss possible plea negotiations (Tr. 124).

Given these unopposed findings of fact, we agree with Magistrate Gelpí's conclusion that Petitioner has proven by more than a preponderance of the evidence that his attorney represented him under an actual conflict of interest. Petitioner's legal representation was funded by a person involved in the same criminal activity who eluded capture. This conflict manifested itself in counsel's deficient and unethical performance. See Familia-Consoro v. United States, 160 F.3d 761, 766 (1st Cir. 1998)("There is always a possibility when a third party with an arguable stake in the outcome holds the purse strings that a lawyer might place his own proprietary interest above those of his client."). Mr. Pérez-Olivo's persistence in refusing to enter into plea negotiations and his advise to the contrary cannot be otherwise rationalized.

Our finding that Mr. Pérez-Olivo engaged in unethical conduct, including suggesting and possibly attempting to bribe jurors, witnesses, and the prosecution, is hardly far fetched. Mr. Pérez-Olivo has unequivocally engaged in unethical conduct in the past. First, on December 14, 2001 Mr. Pérez-Olivo was disbarred by the Puerto Rico Supreme Court for receiving $30,000 for a federal criminal appeal which he never filed or communicated with his client thereafter and for failing to respond to numerous Court orders in the disbarment proceedings (Petitioner's Exhibit 1). Second, this Court previously granted a *habeas corpus* petition, vacating a conviction because Mr. Pérez-Olivo failed to communicate to his client a plea offer made by the Government, prompting him instead to go to trial. Falú-González v. United States, Civil No. 02-1127(SEC), slip op. (D.P.R. Oct. 31, 2001). In the third place, disbarment proceedings were initiated in this district against Mr. Pérez-Olivo. However, prior

to the issuance of a ruling Mr. Pérez-Olivo voluntarily resigned from the federal bar after Magistrate Judge Aida Delgado-Colón held an evidentiary hearing at which both Petitioner and Mr. Confesor Falú-González, among other former clients, testified against him.

Notwithstanding Mr. Pérez-Olivo's past unethical conduct, the question before us is whether Petitioner was deprived of effective assistance of counsel because of his attorney's conflict of interest. A convicted defendant who alleges ineffective assistance of counsel must show that the errors committed were so serious that the assistance of counsel fell below an objective standard of reasonableness. United States v. Michaud, 925 F.2d 37, 41 (1st Cir. 1991); United States v. Levy, 897 F.2d 596 (1st Cir. 1990). See, e.g., Tollett v. Henderson, 411 U.S. 258 (1973); McCann v. Richardson, 397 U.S. 759 (1970). To establish a claim of ineffective assistance of counsel, a criminal defendant must show both that his counsel's performance was deficient and that this deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668 (1984). To make this showing, the defendant must overcome the strong presumption that counsel rendered adequate assistance by demonstrating that counsel's representation fell outside the "wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 690-91, 694. Thus, "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700.

As to counsel's performance, Mr. Pérez-Olivo did not explain to Petitioner the criminal proceedings instituted against him with its intricate ramifications nor the evidence against him. Petitioner's attorney at all times reiterated that cooperation was not a feasible alternative. Instead, he expressed that he had power over the judge and the prosecutors and suggested that the jury be bribed. Clearly, Petitioner's trial counsel's performance fell below an objective standard of reasonableness. His actions, or lack thereof, cannot be characterized as strategic choices. See Halloway v. Arkansas, 435 U.S. 475, 490-91 (1978)(stating that in

the context of conflicting interests, "the evil – it bears repeating – is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.").

The second part of the inquiry is whether Petitioner was prejudiced by his attorney's deficient performance. However, in the instant case, Petitioner need not show prejudice as it is "assumed from the existence of the conflict." United States v. Foster, 469 F.2d 1, 4 (1st Cir. 1972). In fashioning this two prong inquiry, the Supreme Court in Strickland took the opportunity to address ineffectiveness claims premised on actual conflicts of interests specifying that said cases warrant a limited presumption of prejudice. As stated by the Supreme Court, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance." Id. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350, 348 (1985) (holding "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief)(footnote omitted)). Petitioner has met this threshold, therefore, he need not demonstrate prejudice. Thus, Petitioner has more than satisfied his burden of establishing a Sixth Amendment violation and his conviction and sentence must be vacated accordingly.

Finally, we take this opportunity to comment on the issue of guilt. Petitioner does not contest his guilt. However, that is not the criteria that guides our inquiry. Regardless of Petitioner's guilt, he had the constitutional right to effective assistance of counsel. Accordingly, his conviction must be reversed even if he is "clearly guilty." Halloway, 435 U.S. at 489 (quoting Chapman v. California, 386 U.S. 18, 43 (1967)(Stewart, J., concurring); (citing Tumey v. Ohio, 273 U.S. 510(1927)).

**Civil No. 02-1157(SEC)**                                                                11

**Conclusion**

For the reasons herein stated, we **APPROVE** and **ADOPT** Magistrate Judge Gelpí's Report and Recommendation as our own. Consequently, Petitioner's motion is **GRANTED** and his conviction, sentence, and judgment in Criminal Case 96-280(SEC) is hereby **VACATED** accordingly. There being no other matter pending, the above captioned action will be **DISMISSED WITH PREJUDICE**. Judgment shall be entered accordingly.

        **SO ORDERED.**
        In San Juan, Puerto Rico, this 2nd day of June, 2005.

                        S/ *Salvador E. Casellas*
                        SALVADOR E. CASELLAS
                        United States District Judge